**Kenneth M. ZERAN, Plaintiff,**

v.

**AMERICA ONLINE, INC., Defendant.**

**Civil Action No. 1:96cv1564.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 21, 1997.

John S. Edwards, Roanoke, VA, Leo Kayser, III, Kayser & Redfern, L.L.P., New York City, James A. Ikard, Abel, Musser Sokolosky Mares Haubrich Burch & Kouri, Oklahoma City, OK, for Plaintiff.

Sara Needleman Kline, Patrick J. Carome, John Payton, Samir Jain, Wilmer, Cutler & Pickering, Washington, DC, Eric J. Groves, Groves & Tague, Oklahoma City, OK, Randall J. Boe, Elizabeth DeGrzia Blumenfeld, America Online, Inc., Dulles, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff Kenneth M. Zeran ("Zeran") was the victim of a malicious hoax perpetrated via the Internet[1] services of defendant America Online, Inc. ("AOL"). An unknown person or persons, acting without Zeran's knowledge or authority, affixed Zeran's name and telephone number to a series of notices on AOL's electronic "bulletin board" advertising t-shirts and other items with slogans glorifying the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma in which 168 people were killed. Predictably, Zeran received numerous disturbing and threatening telephone calls from people outraged with the posted notice. He now sues, claiming AOL was negligent in allowing these notices to remain and reappear on AOL's "bulletin board" despite having received notice and complaints from Zeran following the appearance of the first advertisement.

AOL seeks a threshold dismissal of the claim, pursuant to Rule 12(c), Fed.R.Civ.P., on the basis of the immunity that the Communications Decency Act of 1996 ("the CDA"), confers on Internet providers with respect to the information appearing on their services from third party sources. Zeran responds by asserting that the CDA does not bar his claim, or, in the alternative, that it is inapplicable to his claim. Thus, the questions presented are:

(1) whether the CDA preempts a state law negligence claim against an interactive computer service provider for that provider's allegedly careless dissemination of defamatory statements; and

---

1. The "Internet", as the term is used here, refers to the immeasurable network of computers interconnected for the purpose of communication and information exchange. This network can be accessed in a variety of ways, including through commercial "online services" such as America Online, Inc. These commercial services offer access to their own computer network and organizational software allowing subscribers to interconnect easily with computer networks other than those proprietary to the "online service." *See American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 830–38 (E.D.Pa.1996), *prob. juris. noted*, —— U.S. ——, 117 S.Ct. 554, 136 L.Ed.2d 436 (1996) (explaining in considerable detail the creation, development, operation and private regulation of the Internet).

(2) whether the CDA applies to causes of action brought after its effective date, but arising out of events occurring before that date.

### I.[2]

AOL's interactive computer services provide a variety of methods to transmit information, including both private communications such as electronic mail, and public communications. One means of public communication is an AOL "bulletin board", which allows AOL subscribers to post messages for review by AOL's other subscribers. At 2:54 p.m. on April 25, 1995, a notice appeared on AOL's bulletin board authored by an unknown person or persons identified only as "Ken ZZ03" and titled "Naughty Oklahoma T–Shirts". The notice advertised t-shirts with vulgar and offensive slogans related to the Oklahoma City tragedy.[3] Readers were invited to call "Ken", Zeran's first name, at Zeran's telephone number. This posting was made without Zeran's knowledge or authority and it is undisputed that he has never been involved in any way with the sale of the advertised t-shirts. Indeed, Zeran has never subscribed to AOL's Internet services.

This posting of the bogus notice on AOL's bulletin board, an act within the capacity of even novice Internet users, had its intended pernicious effect. Zeran was inundated with calls, most of which were derogatory and some of which included death threats and intimidation. On April 25, 1995, the day the notice first appeared, Zeran also received a call from a reporter investigating the advertisement of the tasteless t-shirts. Zeran informed the reporter that he was neither responsible for, nor associated with, the advertisement, and that he planned to contact AOL to demand prompt removal of the notice and a retraction. Zeran did precisely this that same day, and an AOL representative assured him that the offending notice would be removed. As a matter of policy, however, AOL declined to post a retraction on its network. To his dismay, Zeran continued to be inundated with offensive and threatening telephone calls. Unable to suspend or change his telephone number due to business necessity,[4] Zeran was forced to tolerate the harassment and threats occasioned by the hoax.

It appears that while the first notice was deleted from AOL by April 26, 1995, a new notice appeared on the network that same date under a slightly modified identifier of "Ken ZZ033". This second notice declared that some t-shirts from the prior day's notice had "SOLD OUT", and announced that several new slogans were now available.[5] The second notice also announced that one dollar from every sale would be donated to the victims of the bombing. And, as with the first notice, this notice ended by listing Zeran's first name and telephone number.

Zeran learned of the second notice when he received a telephone call on April 26, 1995, from a reporter who faxed him a printed copy of the April 26 AOL posting. Again the barrage of threatening and angry phone calls began. And Zeran once again called AOL to demand that AOL delete the notice and take steps to block further bogus messages using his name and phone number. In response, an AOL operator advised him that steps were being taken to delete the notice and

---

**2.** Although AOL denies various allegations contained in the complaint, it appears that few, if any, material facts are in dispute. In any event, for the purposes of this Rule 12(c) motion, Zeran is entitled to a review of the pleadings in the light most favorable to him, with the benefit of all reasonable inferences. *See, e.g., Madonna v. United States*, 878 F.2d 62, 65 (2nd Cir.1989).

**3.** In the first notice, six slogans were allegedly available, including "Visit Oklahoma ... It's a BLAST!!!", "Putting the kids to bed ... Oklahoma 1995", and "McVeigh for President 1996".

**4.** The record reflects that Zeran operates a publishing business from his home in Seattle, Washington. Specifically, Zeran's publications include a monthly listing of apartments available in the Puget Sound area. He contends that these listings, as well as his other commercial ventures he operates, depend on his ability to communicate frequently with businesses via a publicized telephone number. This publicized telephone number is the number listed in the bogus AOL notice.

**5.** The new slogans were at least as vulgar and offensive as those listed in the prior day's notice. Among the new slogans were "Forget the rescue, let the maggots take over—Oklahoma 1995", and "Finally a day care center that keeps the kids quiet—Oklahoma 1995".

terminate the account that was posting the notices. The operator also suggested to Zeran that he call the police and report this incident. Zeran accepted this suggestion and called the FBI in Seattle to report the situation. Despite AOL's assurance that the notice would be promptly deleted, various similarly offensive notices continued to appear through May 1, 1995. These notices, like those posted earlier, purported to be authored by "Ken Z033" and advertised offensive Oklahoma City bombing paraphernalia, including bumper stickers, key chains and t-shirts, and even computer software and hardware packages.

Zeran claims that in the final days of April he received a flood of abusive telephone calls, one approximately every two minutes. To make matters worse, a copy of the April 25 notice was brought to the attention of Mark Shannon, a broadcaster at radio station KRXO in Oklahoma City. On May 1, 1995, Shannon read the slogans from the notice on the air, and encouraged listeners to call "Ken" at Zeran's telephone number to register their disgust and disapproval. This predictably resulted in yet another cascade of threatening, intimidating, any angry telephone calls to Zeran. So threatening and abusive were some callers that local police kept Zeran's house under protective surveillance. Although an Oklahoma City newspaper ran a story exposing the t-shirt advertisements as a hoax and the radio station broadcast an apology,[6] this brought Zeran little relief. He received some apologies and offers of assistance from earlier callers, but the deluge of threatening and abusive telephone calls persisted. Not until May 15, 1995, did the threatening and abusive telephone calls subside to approximately fifteen per day.

Zeran filed suit on January 4, 1996, against radio station KRXO in the United States District Court for the Western District of Oklahoma. In April 1996, he filed this separate action against AOL in the same court, alleging that AOL was negligent in failing to respond adequately to the bogus notices on its bulletin board after being made aware of their malicious and fraudulent nature. In response, AOL filed a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), Fed.R.Civ.P., or, in the alternative, to transfer the action, pursuant to 28 U.S.C. § 1404(a), from Oklahoma to this district, where AOL maintains its headquarters. By Order dated October 16, 1996, the United States District Court for the Western District of Oklahoma granted the motion to transfer, but deferred the motion to dismiss, stating that the issue of whether the complaint states a claim "should be resolved by the transferee forum." On December 13, 1996, AOL answered Zeran's complaint, and now withdraws its motion to dismiss in favor of the instant motion for judgment on the pleadings, pursuant to Rule 12(c), Fed. R.Civ.P.

## II.

Judgment on the pleadings, pursuant to Rule 12(c), Fed.R.Civ.P., authorizes resolution of a matter where no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. See *Republic Ins. Co. v. Culbertson*, 717 F.Supp. 415, 418 (E.D.Va.1989). In evaluating a Rule 12(c) motion, the pleadings are viewed in the light most favorable to the non-moving party, and all reasonable inferences are drawn in favor of that party. *Madonna v. United States*, 878 F.2d 62, 65 (2nd Cir.1989); *see also Bruce v. Riddle*, 631 F.2d 272, 274 (4th Cir.1980). A Rule 12(c) dismissal is warranted where the pleadings, construed favorably to the non-movant, make clear that a "plaintiff could prove no set of facts in support of his claim which would entitled him to relief." *Bruce*, 631 F.2d at 274. Thus, AOL contends that even assuming the truth of Zeran's pleadings and viewing those pleadings in the light most favorable to him, Zeran cannot recover from AOL.

## III.

Zeran sues AOL for negligence, under the theory that distributors of information are liable for the distribution of material which they knew or should have known was of a

---

**6.** Zeran characterizes KRXO's on-air apology as "disingenuous". The accuracy of this characterization is immaterial to the disposition of the motion at bar.

defamatory character. *See Cubby, Inc. v. CompuServe Inc.*, 776 F.Supp. 135, 141 (S.D.N.Y.1991) (holding that defendant could not be liable for distributing defamatory statements unless it knew or had reason to know of statements).[7] AOL does not contend for the purposes of this motion that Zeran has not alleged the elements of distributor liability. Instead, AOL contends that this state tort action is preempted by the enactment of the CDA.

The CDA was signed into law and became effective on February 8, 1996. Section 230 of the CDA, titled "Protection for private blocking and screening of offensive material", represents an initial federal effort to define the appropriate scope of federal regulation of the Internet. *See* 47 U.S.C. § 230.[8] The CDA does not provide a statutory basis for Zeran's claim, nor does Zeran rely on it for that purpose. Zeran's alleged cause of action is pursuant to a duty he claims state law imposes on distributors to refrain from distributing material they knew or should have known was defamatory. Thus, the question presented is whether the CDA preempts any state common law cause of action Zeran may

have against AOL resulting from its role in the malicious hoax perpetrated via AOL's electronic bulletin board.

■ The preemption of state law causes of action is mandated, in certain circumstances, by the Supremacy Clause of the United States Constitution, which directs that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI § 2; *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819). Preemption analysis under the Supremacy Clause properly begins with "the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). With this caveat in mind, there are two circumstances in which preemption of a state law cause of action is appropriate, namely, (i) where Congress specifically intends to displace state law in a particular field, and (ii) where state law directly conflicts with federal law.[9]

---

7. *Cubby* involves the application of New York defamation law. Neither party addresses the choice of law issue lurking here, namely which state's tort law is applicable to an alleged injury caused by an anonymous posting of a bogus message on an interactive computer system operated by a corporation residing in Virginia where the notice is available for review by online subscribers internationally and results in harm to a plaintiff in Washington. Zeran's complaint was filed in Oklahoma. Thus, the conflict of laws rules of Oklahoma determine what substantive state law applies to the tort alleged in this case. *See, e.g., Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). And that law would also apply here, as the law of the transferee forum applies in § 1404(a) transfers. *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964). Yet, the parties do not address the choice of law issue. Instead, Zeran asserts in his opposition brief, with no citation, that "[t]he negligence of a distributor is actionable in every jurisdiction." AOL does not address this assertion, but simply claims that the CDA bars distributor liability as well as publisher liability under any state's law. In any event, the analysis here proceeds on the assumption that the governing state law would hold, as most state courts do, that distributors of defamatory material are liable if the distributor knew or had reason to know of the defamatory nature of the material. *See generally* Restatement (Second) of Tort § 581 cmt. d (1977).

8. In relevant part, the CDA provides:

  (c) PROTECTION FOR 'GOOD SAMARITAN' BLOCKING AND SCREENING OF OFFENSIVE MATERIAL.—

  (1) TREATMENT OF PUBLISHER OR SPEAKER.—No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

  (2) CIVIL LIABILITY.—No provider or user of an interactive computer service shall be held liable on account of—

  (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

  (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

9. The Supreme Court has observed that preemption is appropriate in three circumstances: (i) where Congress expresses an intent to displace state law, (ii) where Congress implies such an intent, and (iii) where state law conflicts with federal law. *See English*, 496 U.S. at 78, 110 S.Ct. at 2274–75. While this is clearly correct,

## · A.

■ The Supreme Court has observed that "preemption fundamentally is a question of congressional intent." *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990) (citing *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988)). Congress' intent to preempt a particular field can be expressed or implied. Express preemption occurs where Congress "defines explicitly the extent to which its enactments preempt state law", *English,* 496 U.S. at 78, 110 S.Ct. at 2275, whereas intent to preempt is implied where a scheme of federal regulation is so pervasive that it leaves no room within which a state may act. *See Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Feikema v. Texaco, Inc.,* 16 F.3d 1408, 1412 (4th Cir.1994).[10]

■ The focus of the inquiry for express preemption is the statutory language.[11] A familiar example of statutory language reflecting Congress' preemption intention can be found in § 514(a) of the Employee Retirement Income Security Act ("ERISA"), which provides, in relevant part, that

provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a). The ERISA statute further directs that "State law" superseded by ERISA pursuant to § 514(a) includes "all laws, decision, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). And finally, the ERISA statute explicitly exempts certain state laws from preemption, including state laws regulating insurance, banking, or securities, and state criminal laws. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91, 103 S.Ct. 2890, 2896–97, 77 L.Ed.2d 490 (1983) (citing 29 U.S.C. § 1144(b)). Thus, ERISA explicitly defines the extent to which Congress intended federal preemption of state law.[12]

The CDA, in sharp contrast to ERISA and other similar provisions, contains no explicit expression of congressional intent with respect to the scope of preemption. Section 230 of the CDA section addresses the provision's effect on state law, providing that:

496 U.S. at 78–79, 110 S.Ct. at 2274–75.

---

the first two circumstances are simply two ways in which congressional intent may be discerned. Viewed in this way, the preemption inquiry is broken down into two categories, namely, (i) intentional preemption, express or implied, and (ii) preemption due to direct conflict. *See Feikema v. Texaco, Inc.,* 16 F.3d 1408, 1412 (4th Cir.1994) ("There are two ways for preemption to occur.") Of course, there is overlap in the examination of preemption under these two theories, and the categorizations are not rigid or exclusive. *See English,* 496 U.S. at 79 n. 5, 110 S.Ct. at 2275 n. 5 ("[F]ield pre-emption may be understood as a species of conflict pre-emption . . .").

10. Thus, an examination of intentional preemption is, in essence, a classic exercise in statutory interpretation wherein the statutory language is examined for its plain and unambiguous meaning, with any ambiguities resolved by reference to the statute's purpose. *See Ringling Bros.— Barnum & Bailey Combined Shows Inc. v. Utah Division of Travel Development,* 935 F.Supp. 763, 765 (E.D.Va.1996).

11. In *English,* the Supreme Court observed:
[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one.

12. For additional examples of statutory language reflecting Congress' intent as to preemption, *see* 2 U.S.C. § 453 ("The provisions of this Act [the Federal Election Campaign Act of 1971], and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office."); 15 U.S.C. § 1461 (defining the preemptive scope of the federal labeling program) ("It is hereby declared that it is the express intent of Congress to supersede any and all laws of the States or political subdivisions thereof insofar as they may now or hereafter provide for the labeling of the net quantity of contents of the package of any consumer commodity covered by this chapter which are less stringent than or require information different from the requirements of section 1453 of this title or regulations promulgated pursuant thereto."); 29 U.S.C. § 633(a) (defining preemptive scope of federal cause of action for age discrimination in employment) ("Nothing in this chapter shall affect the jurisdiction of any agency of any State performing like functions with regard to discriminatory employment practices on account of age except that upon commencement of action under this chapter such action shall supersede any State action.").

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C. § 230(d)(3). This provision does not reflect congressional intent to preempt state law remedies for defamatory material on an interactive computer service. To the contrary, § 230(d)(3) reflects Congress' clear and unambiguous intent to retain state law remedies except in the event of a conflict between those remedies and the CDA.

■■■ This conclusion is supported by the second prong of the intentional preemption inquiry, namely the search for implied preemption. Congressional intent to occupy a field exclusively, and thereby preempt state law, can be implied where Congress has regulated "so pervasively in the field as not to leave any room within which a state may act." *Feikema,* 16 F.3d at 1412. In other words, where the dominance of federal intervention in a field is such that any state law addressing the field would duplicate or be in direct conflict with federal law, Congress' is held to have intended to preempt the field. As a threshold matter, it is worth noting that where, as here, Congress has clearly expressed an intent not to preempt the field, the Congressional intent inquiry should ordinarily end. In other words, implied preemption through pervasive occupation of a field is merely a means of determining congressional intent with respect to pre-emption, an exercise unnecessary where, as here, that intent

is otherwise clearly expressed.[13] But, nonetheless, that exercise points to the same result.

The purposes and objectives of the CSA support the conclusion that Congress did not intend to occupy the field of liability for providers of online interactive computer services to the exclusion of state law. Section 230's language and legislative history of reflect that Congress' purpose in enacting that section was not to preclude any state regulation of the Internet,[14] but rather to eliminate obstacles to the private development of blocking and filtering technologies capable of restricting inappropriate online content.[15] This purpose belies any congressional intent to bring about, through the CDA, exclusive federal regulation of the Internet. Accordingly, the CDA reflects no congressional intent, express or implied, to preempt all state law causes of action concerning interactive computer services.

### B.

■■■ Yet, even where Congress does not intend to occupy a field exclusively, the Supremacy Clause commands preemption of state laws to the extent that such laws directly conflict with federal law.[16] Direct conflicts requiring preemption exist:

(1) where it is impossible for a private party to comply with both federal and state law, *see, e.g, Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210 [1217–18], 10 L.Ed.2d 248 (1963);

---

**13.** The only exception to this general rule arises when Congress provides expressly for no preemption while simultaneously occupying the field to a degree that no state law may exist without creating a direct conflict. This circumstance is not present here.

**14.** To be sure, the CDA's general policy statements apparently endorse a laissez faire policy with respect to the Internet. *See, e.g.,* 47 U.S.C. § 230(b) ("It is the policy of the United States ... (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation...."). But the CDA, in fact, neither prohibits state regula-

tion, nor provides a comprehensive federal scheme precluding any state regulatory function.

**15.** *See, e.g.,* H.R. 101–458 at 194 (1996) (purpose of § 230 of CDA is to provide "Good Samaritan" protection for providers or users of interactive computer services for actions taken to restrict access to objectionable material); *see also, infra,* Part III–B–3.

**16.** Preemption resulting from direct conflict is not only constitutionally mandated, but commanded by the CDA itself. *See* 47 U.S.C. § 230(d)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

(2) where state law conflicts with the express language of the federal statute, *see, e.g., Mobil Oil v. Virginia Gasoline Marketers,* 34 F.3d 220, 226 (4th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995) ("Federal law may preclude state law that is inconsistent with . . . the federal law."); and

(3) where state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *English,* 496 U.S. at 79 [110 S.Ct. at 2275] (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399 [404], 85 L.Ed. 581 (1941)).

These theories of direct conflict preemption will be addressed in turn.

### 1. *Impossibility of Compliance with State and Federal Law*

■ The first type of direct conflict arises where compliance with both federal and state regulations is "a physical impossibility." *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) (explaining that a federal law prohibiting the sale of avocados with an oil content over 7% would preempt a state law prohibiting the sale of avocados with an oil content under 8% because compliance with both requirements would be impossible). This is not such a case; this is not a case where a party is subjected to contradictory federal and state duties, as in the hypothetical discussed in *Florida Lime.* Nothing in the CDA imposes a duty on AOL that would conflict with a state law duty to avoid negligent distribution of defamatory material. Put another way, an interactive computer service provider, like AOL, can comply with the CDA even if it is subjected to state liability for negligent distribution of defamatory material.

### 2. *Conflict with the Language of the CDA*

■ Preemption is also required where state law conflicts with the express language of a federal statute. In this case, Zeran seeks to hold AOL liable for its alleged negligence in allowing the bogus notices to remain and reappear after learning of their fraudulent nature from Zeran. This theory of liability derives chiefly from *Cubby,* a case decided over four years before the passage of the CDA. *Cubby,* 776 F.Supp. at 135. In *Cubby,* the district court concluded that the defendant interactive computer service, CompuServe, was a distributor for the purposes of defamation liability, and thus was liable only if it "knew or had reason to know of the alleged defamatory . . . statements." *Id.* at 141. This "reason to know" standard is consistent with the standard of liability for entities such as news vendors, book stores, and libraries who, while not charged with a duty to review the materials they distribute, are liable if they distribute materials they know or have reason to know contain defamatory statements.[17] Thus, Zeran contends that on learning of the fake notice on the AOL bulletin board advertising the tasteless T-shirts, AOL had a duty to take reasonable steps to prevent the distribution of this posting. Zeran further contends that the scope of this reasonable duty, and whether AOL complied with it, are questions for a jury.

AOL responds by contending that a state cause of action for distributor liability is preempted because it directly conflicts with the language of § 230 of the CDA. Specifically, AOL points to § 230(c)(1), which states that

[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

Zeran does not contest that AOL is an interactive computer service as defined by the CDA and it is clear that AOL meets the statutory definition of such a service.[18] Nor

---

**17.** *See* Restatement (Second) of Torts § 581 cmt. d (1977); *see, e.g., Dworkin v. Hustler Magazine, Inc.,* 634 F.Supp. 727, 729 (D.Wyo.1986) (distributor liability requires either actual knowledge or reason to know that distributed material was defamatory).

**18.** The CDA defines interactive computer service as:

any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specially a service or system

does Zeran claim that the bogus notices were anything but "information provided by another information content provider." Thus, the preemption issue reduces to the question whether a state cause of action for negligent distribution of defamatory material directly conflicts with the CDA's prohibition against treating an Internet provider as a "publisher or speaker". Put another way, the question is whether imposing common law distributor liability on AOL amounts to treating it as a publisher or speaker. If so, the state claim is preempted.

The key to answering this question lies in understanding the true nature of so-called distributor liability and its relationship to publisher liability. At the heart of Zeran's argument is the premise that distributor liability is a common law tort concept different from, and unrelated to, publisher liability. This is not so; distributor liability, or more precisely, liability for knowingly or negligently distributing defamatory material, is merely a species or type of liability for publishing defamatory material.[19] This relationship is apparent from the Restatement (Second) of Tort § 577 definition of "publication" of defamatory material, which states,

(1) Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed.

(2) One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication.

Thus, a publisher is not merely one who intentionally communicates defamatory infor- mation. Instead, the law also treats as a publisher or speaker one who fails to take reasonable steps to remove defamatory statements from property under her control.

Illustrative of this point is *Tacket v. General Motors Corp.*, 836 F.2d 1042, 1046 (7th Cir.1987), where the Seventh Circuit considered the liability of an employer who, for approximately eight months, failed to remove an allegedly defamatory sign painted by an unknown third party on the wall of the workplace. In discussing defendant's possible liability, the panel, citing § 577(2) of the Restatement (Second) of Torts, stated that to find defendant liable, a jury must conclude that defendant " 'intentionally and unreasonably' fail[ed] to remove this sign and thereby published its contents." 836 F.2d at 1047 (emphasis added). Thus, failure to remove defamatory material provided by a third party was deemed to constitute a form of "publication." Similarly, distributor liability applies where certain parties, such as news vendors or interactive computer services, will be held to have "published" material provided by third parties because they fail to take reasonable steps to prevent the dissemination of that defamatory information. Properly understood, therefore, distributor liability treats a distributor as a "publisher" of third party statements where that distributor knew or had reason to know that the statements were defamatory. It follows that Zeran's attempt to impose distributor liability on AOL is, in effect, an attempt to have AOL treated as the publisher of the defamatory material. This treatment is contrary to § 230(c)(1) of the CDA and, thus, Zeran's claim for negligent distribution of the notice is preempted.[20]

---

that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.
47 U.S.C. § 230(e)(2). AOL provides access for subscribers to a computer server that facilitates access to the Internet.

**19.** To be sure, Zeran is not the first plaintiff to attempt the avoid the strictures of defamation law by disguising a defamation claim as another tort. Courts uniformly reject such attempts. *See, e.g., Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) (plaintiff cannot avoid strictures of defamation law through pleading intentional infliction of emotional distress); *Moldea v. New York Times Co.*, 15 F.3d 1137, 1151 (D.C.Cir.1994), *modified on other grounds*, 22 F.3d 310 (D.C.Cir.1994) (plaintiff cannot avoid strictures of defamation law through pleading alternative tort of false light invasion).

**20.** This preemption conclusion is, of course, limited to the state law claim for negligent distribution asserted here. This opinion neither addresses nor embraces the broader position advanced by AOL's counsel in oral argument to the effect that the CDA precludes AOL's liability for any information appearing on its system unless that information was provided by AOL itself. By

### 3. *Conflict with the Purposes and Objectives of the CDA*

█ An alternative basis for preemption exists if subjecting AOL to state law distributor liability would stand "as an obstacle to the accomplishment of the full purposes and objectives of Congress" in passing § 230 of the CDA. *See, e.g., English*, 496 U.S. at 79, 110 S.Ct. at 2275. Section 230 itself provides some insight into Congress' purposes and objectives in passing that provision, stating, in part, that

It is the policy of the United States:

. . .

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services; [and]

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material. . . .

47 U.S.C. § 230(b). The scant legislative history reflects that the "disincentive" Congress specifically had in mind was liability of the sort described in *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (Sup.Ct.N.Y. May 24, 1995).[21] There, Prodigy, an interactive computer service provider, was held to have published the defamatory statements of a third party in part because Prodigy had voluntarily engaged in some content screening and editing and therefore knew or should have known of the statements. Congress, concerned that such rulings would induce interactive computer services to refrain from editing or blocking content, chose to grant immunity to interactive computer service providers from suits arising from efforts by those providers to screen or block content.[22] Thus, Congress' clear objective in passing § 230 of the CDA was to encourage the development of technologies, procedures and techniques by which objectionable material could be blocked or deleted either by the interactive computer service provider itself or by the families and schools receiving information via the Internet. If this objective is frustrated by the imposition of distributor liability on Internet providers, then preemption

AOL's lights, it is immune from state common law liability for any material on its network as long as that material was put online by a third party. And this is so, AOL's counsel contended, even if AOL knew of the defamatory nature of the material and made a decision not to remove it from the network based on a malicious desire to cause harm to the party defamed. These facts were not presented here, nor do they appear to have been contemplated by Congress. In any event, there is no occasion here to consider whether, under some set of facts, information initially placed online by a third party might be deemed to be information provided by the service provider itself, thereby rendering § 230(c) inapplicable.

**21.** *See* H.R.Rep. No. 104–458, at 194 (1996) ("One of the specific purposes of this section is to overrule *Stratton Oakmont v. Prodigy* and any other similar decision which have treated providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material. The conferees believe that such decisions create serious obstacles to the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services.").

**22.** Section 230(c) creates two distinct forms of immunity. Subsection (c)(1), discussed above, immunizes interactive computer service providers and users from defamation liability premised on theories similar to that proposed in *Stratton Oakmont* and, indeed, in this case. *See supra* Part III–B–2. On the other hand, subsection (c)(2) precludes holding an interactive computer service provider or user liable on account of (i) actions taken in good faith to restrict access to material that the provider or user deems objectionable, and (ii) actions taken to provide others with the technical means to restrict access to objectionable material. Thus, § 230(c)(2) appears to immunize such providers and users from causes of action brought by persons whose material is screened or blocked from the Internet. In sum, § 230 provides immunity for Internet providers against causes of action brought by persons alleging harm, such as defamation injury, resulting from the dissemination of material, § 230(c)(1), and causes of action brought by persons alleging harm resulting from the deletion or restriction, of their material. § 230(c)(2). Section 230 was expressly not intended to provide immunity for a cause of action for "cancelblotting", wherein recipients of a message respond to the message by deleting the message from the computer systems of others without having the right to do so. *See* H.R. Rep. 104–458, at 194.

is warranted. Closely examined, distributor liability has just this effect.

Internet providers subjected to distributor liability are less likely to undertake any editing or blocking efforts because such efforts can provide the basis for liability. For example, distributors of information may be held to have "reason to know" of the defamatory nature of statements made by a third party where that party "notoriously persists" in posting scandalous items. *See, e.g.,* Restatement (Second) of Torts § 581 cmt. d. An Internet provider's content editing policy might well generate a record of subscribers who "notoriously persist" in posting objectionable material. Such a record might well provide the basis for liability if objectionable content from a subscriber known to have posted such content in the past should slip through the editing process. Similarly, an Internet provider maintaining a hot-line or other procedure by which subscribers might report objectionable content in the provider's interactive computer system would expose itself to actual knowledge of the defamatory nature of certain postings and, thereby, expose itself to liability should the posting remain or reappear. Of course, in either example, a Internet provider can easily escape liability on this basis by refraining from blocking or reviewing any online content. This would eliminate any basis for inferring the provider's "reason to know" that a particular subscriber frequently publishes objectionable material. Similarly, by eliminating the hot-line or indeed any means for subscribers to report objectionable material, an Internet provider effectively eliminates any

actual knowledge of the defamatory nature of information provided by third parties. Clearly, then, distributor liability discourages Internet providers from engaging in efforts to review online content and delete objectionable material,[23] precisely the effort Congress sought to promote in enacting the CDA. Indeed, the most effective means by which an Internet provider could avoid the inference of a "reason to know" of objectionable material on its service would be to distance itself from any control over or knowledge of online content provided by third parties. This effect frustrates the purpose of the CDA and, thus, compels preemption of state law claims for distributor liability against interactive computer service providers. *See, e.g., English,* 496 U.S. at 79, 110 S.Ct. at 2275.[24]

In sum, although the CDA does not preempt all state law causes of action concerning interactive computer services, it does preempt Zeran's claim. This is so because his "negligence" cause of action conflicts with both the express language and the purposes of the CDA.

### IV.

■ Zeran contends that even if the CDA preempts a state law cause of action for negligent distribution of defamatory statements, it cannot have that effect here without violating the stricture against retroactive application of statutes. The CDA was signed into law and became immediately effective on February 8, 1996, over nine months after the posting of the bogus notices that form the basis of Zeran's claims against AOL. Yet,

---

**23.** To be sure, the distributor liability theory in *Cubby* asserted here by Zeran, is different in some respects from the *Stratton Oakmont* liability theory precluded by the CDA. Yet, there is also an important similarity in the two theories; both theories discourage Internet providers from undertaking efforts to block or edit the material on their computer systems by using such efforts as a basis for liability.

**24.** The CDA reflects Congress' attempt to strike the right balance between the competing objectives of encouraging the growth of the Internet on one hand, and minimizing the possibility of harm from the abuse of that technology on the other. And, to be sure, various approaches are available for accomplishing Congress' purpose of encouraging the development of online screening

technologies and procedures. For example, holding interactive computer service providers strictly liable for the content on their systems would likely lead to rapid development of mechanisms by which to block objectionable material. But Congress struck a different balance between the competing concerns, electing to immunize Internet providers from forms of liability that discourage those providers from acquiring information about and control over the content on their systems. And that decision is appropriately the province of Congress. But the Internet is a rapidly developing technology—today's problems may soon be obsolete while tomorrow's challenges are, as yet, unknowable. In this environment, Congress is likely to have reasons and opportunities to revisit the balance struck in CDA.

Zeran did not file this complaint until April 1996, two months after the CDA went into effect. This, then, is a case brought after a statute's enactment but based on facts that occurred prior to its enactment. In these circumstances, a statute may not have a "retroactive effect" absent a clear expression of congressional intent with respect to such retroactivity. *See Landgraf v. USI Film Products,* 511 U.S. 244, 280–81, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). Thus, a court must first determine whether Congress has clearly expressed the statute's intended temporal reach. If so, the judicial inquiry is complete and Congress' clear intent must be implemented. *Id.* If, on the other hand, the statute has no express Congressional command with respect to its temporal application, courts must undertake a second inquiry to determine whether the application of the statute will result in a prohibited "retroactive effect." [25] *Id.* In this case, the first step is dispositive, Congress has made its intent manifest.

Section 230 clearly reflects Congress' intent to apply the CDA to all suits filed after its enactment, notwithstanding when the operative facts arose. Thus, in § 230(d)(3), the CDA provides, in pertinent part, that

> [n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

This subsection does not generally refer to conflicting state laws having "no effect" or being "preempted". To the contrary, it specifically provides that "[n]o causes of action may be brought." And such clear statutory language cannot reasonably be construed to mean that only some causes of action may be brought, namely those concerning events arising before the enactment of the CDA. Thus, while Congress has expressed its intent with respect to retroactivity more directly in other circumstances,[26] subsection (d)(3) constitutes an adequately clear statement of Congress' intent to apply § 230 of the CDA to claims that are filed after the enactment of the CDA.[27] Accordingly, § 230 of the CDA applies to Zeran's claim and, as discussed above, preempts his state law negligence cause of action.

**25.** "Retroactive effect", in this context, has a precise meaning, and is present only where a statute:

> would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.

*Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505. The CDA does not increase the liability of or impose new duties on either party. Thus, the "retroactive effect" question reduces to whether the CDA impairs a right possessed by Zeran. The question whether a not-as-yet filed tort claim constitutes a right protected from retroactive impairment is unsettled. *Compare In re TMI,* 89 F.3d 1106, 1113 (3rd Cir.1996) (statute eliminating pending tort claim does not impair a vested right under due process analysis), *with Maitland v. University of Minnesota,* 43 F.3d 357, 361–63 (8th Cir.1994) (declining to apply statute to antecedent events where such application eliminates a possible cause of action relied on by plaintiff); *see also Landgraf,* 511 U.S. at 289–91, 114 S.Ct. at 1499 & 1524 (debate between majority and Justice Scalia concerning scope of rights protected by presumption against statutory retroactivity). This unsettled question need not be resolved here, given that Congress has expressed its intent concerning the application of the CDA to Zeran's cause of action.

**26.** See, e.g., The Antiterrorism and Effective Death Penalty Act, § 107(a) ("[Provision] shall apply to cases pending on or after the date of enactment of this Act.").

**27.** AOL further contends that the CDA applies to all causes of action **pending** after the statute's enactment date, even if filed before that date. By AOL's lights, Congress' intention to apply the CDA to pending cases is expressed by § 230(d)(3)'s provision that "no causes of action may be brought and no liability may be imposed" pursuant to laws inconsistent with § 230 of the CDA. (emphasis added). AOL relies on the general principle of statutory construction that no provision should be read so as to render superfluous other provisions in the same enactment. *See, e.g., Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2132–33, 109 L.Ed.2d 588 (1990). Thus, for the prohibition of "liability" to have any meaning separate from the prohibition of "causes of action", AOL contends such liability must refer to pending causes of action. AOL's argument is not without considerable force, but it is a close question whether such an interpretation of the CDA satisfies the "clear intent" requirement for retroactive application. *See Landgraf,* 511 U.S. at 272–74, 114 S.Ct. at 1501. And, in any event, this close question is immaterial to determining the retroactive application of the CDA to Zeran's cause of action, which was brought two months after the enactment of the CDA.

In sum, the CDA preempts a negligence cause of action against an interactive computer service provider arising from that provider's distribution of allegedly defamatory material provided via its electronic bulletin board. This preemption is applicable to Zeran's cause of action, brought after the enactment of the CDA, even though the events giving rise to his claim were completed before the CDA became effective. Thus, Zeran can prove no set of facts entitling him to relief against AOL, and AOL's motion for judgment on the pleadings, pursuant to Rule 12(c), Fed.R.Civ.P., must be granted.

An appropriate Order will enter.