783 So.2d 1010 (2001)
Jane DOE, mother and legal guardian of John Doe, a minor, Petitioner,
v.
AMERICA ONLINE, INC., Respondent.
No. SC94355.
Supreme Court of Florida.
March 8, 2001.
Rehearing Denied April 20, 2001.
*1011 Brian W. Smith, West Palm Beach, FL, for Petitioner.
L. Martin Reeder, Jr. of Steel, Hector and Davis, West Palm Beach, FL; and Patrick J. Carome and Samir Chandra Jain of Wilmer, Cutler & Pickering, Washington, DC, for Respondent.
WELLS, C.J.
We have for review Doe v. America Online, Inc., 718 So.2d 385 (Fla. 4th DCA 1998), in which the Fourth District Court of Appeal certified the following questions to be of great public importance:
[1] Whether section 230 of the Communications Decency Act [CDA] applies to complaints filed after its effective date where the complaint alleges a cause of action based upon acts occurring prior to its effective date?
[2] If the answer [to question 1] is in the affirmative, whether section 230 of the Communications Decency Act preempts Florida law?
[3] Whether a computer service provider with notice of a defamatory third party posting is entitled to immunity under section 230 of the Communications Decency Act?
718 So.2d at 390. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.

FACTS AND PROCEDURAL HISTORY
Doe filed a complaint in 1997 against Richard Lee Russell and America Online (AOL), an Internet service provider (ISP), to recover for alleged emotional injuries suffered by her son, John Doe. Doe claimed that in 1994 Russell lured John Doe, who was then eleven years old, and two other minor males to engage in sexual activity with each other and with Russell. She asserted that Russell photographed and videotaped these acts and used AOL's "chat rooms" to market the photographs and videotapes and to sell a videotape. Doe did not allege that Russell transmitted photographs or images of her son via the AOL service. In her six-count complaint, Doe claimed that AOL violated criminal statutes, section 847.011[1] and section 847.0135(2), Florida Statutes (1993).[2] She alleged that AOL was negligent per se in violating section 847.0135, Florida Statutes, by allowing Russell to distribute an *1012 advertisement offering "a visual depiction of sexual conduct involving [John Doe]" and by allowing Russell to sell or arrange to sell child pornography, thus aiding in the sale and distribution of child pornography, including obscene images of John Doe. Doe asserted a separate claim for negligence based on the allegation that AOL knew or should have known that Russell and others like him used the service to market and distribute child pornography; that it should have used reasonable care in its operation; that it breached its duty; and that the damages to John Doe were reasonably foreseeable as a result of AOL's breach. Doe further claimed that complaints had been communicated to AOL as to Russell's transmitting obscene and unlawful photographs or images and that although AOL reserved the right to terminate without notice the service of any member who did not abide by its "Terms of Service and Rules of the Road," AOL neither warned Russell to stop nor suspended his service. Two of the counts in Doe's complaint were directed at Russell.[3]
AOL moved to dismiss Doe's complaint and argued, inter alia, that Doe's claims were barred by 47 U.S.C. § 230 (Supp. II 1996),[4] in that section 230 prohibits civil actions that treat an interactive computer service as the "publisher or speaker" of messages transmitted over its service by third parties.[5] The trial court granted *1013 AOL's motion to dismiss with prejudice, finding that the immunity Congress provided for interactive computer services in section 230 applied to Doe's claims. The Fourth District Court of Appeal affirmed and held that the trial court's conclusion was consistent with Zeran v. America Online, Inc., 129 F.3d 327 (4th Cir.1997), in which the federal circuit court held that "Congress' desire [in enacting 47 U.S.C. § 230] to promote unfettered speech must supersede conflicting common law causes of action." Id. at 334. The Fourth District certified the questions of great public importance to this Court.

SECOND AND THIRD CERTIFIED QUESTIONS
The certified questions in this case focus upon the application of 47 U.S.C. § 230 to Florida tort actions that are based upon alleged "distributor" liability of ISPs. We first address the Fourth District's second and third certified questions and rephrase them into this combined question:
Whether section 230 preempts Florida law as to causes of action based in negligence against an Internet Service Provider (ISP) as a distributor of information allegedly in violation of Florida criminal statutes prohibiting the distribution of obscene literature and computer pornography?
For the purpose of answering the certified question, but without deciding, we accept that the complaint in this case states a cause of action under Florida law[6] for liability in negligence against AOL as a distributor of information. We answer the rephrased certified question in the affirmative and find that section 230 does preempt Florida law as to such a cause of action based upon alleged negligence. We find persuasive the reasoning of the United States District Court in Zeran v. America Online, Inc., 958 F.Supp. 1124, 1131-37 (E.D.Va.1997), and the Fourth Circuit in Zeran, 129 F.3d at 331-32.
The importance of this certified question is obvious in light of the current explosive growth in worldwide use of the Internet. The fundamental issue here is whether companies that provide access to the Internet are subject to common-law civil tort causes of action based upon the laws of each of the fifty states or whether Congress has acted to make ISPs immune from such common-law civil actions.
In reaching our conclusion, we find instructive the analysis of the congressional adoption of section 230 that was provided in the Zeran decisions and in commentaries concerning the Zeran decisions.[7] These sources indicate that two reported judicial decisions from courts in the State of New York were significant in congressional passage of 47 U.S.C. § 230, the Communications Decency Act (CDA), and thus provide assistance in understanding the intent of the Act. The cases are Cubby, Inc. v. CompuServe, Inc., 776 F.Supp. 135 *1014 (S.D.N.Y.1991), and Stratton Oakmont, Inc. v. Prodigy Services Co., 23 Media L. Rep. 1794, 1995 WL 323710 (N.Y.Sup.Ct. 1995). In Cubby, the federal district court held in a defamation action that Compu-Serve, a service provider that offered its subscribers access to an electronic library of news publications, was a mere distributor of information and could not be held liable for libelous statements made in news publications without a showing of actual knowledge. See 776 F.Supp. at 140-41.
Subsequent to the federal Cubby decision, a New York state court decided Stratton Oakmont and concluded that an ISP could be held liable as a publisher of defamatory statements if the ISP retained editorial control over the postings contained on its site. See 23 Media L. Rep. at 1798, 1995 WL 323710. According to one commentator, this created a paradox in that those ISPs who tried to control what was placed on the Internet so as to limit access "to provide decent, family-oriented content [would be] subject to defamation lawsuits and liability on account of their efforts, while [ISPs] who made no efforts to control content would be free of liability."[8]
In 1996, Congress enacted 47 U.S.C. § 230, which was adopted as Title V of the Telecommunications Act of 1996, Pub.L. 104-104, 110 Stat. 56 (1996) (codified in scattered sections of 15 and 47 U.S.C.). See Reno v. ACLU, 521 U.S. 844, 859 n. 24, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The Congressional Conference Report on section 230 specifically states:
[T]his section provides "Good Samaritan" protections from civil liability for providers or users of an interactive computer service for actions to restrict or enable restriction of access to objectionable online material.... [O]ne of the specific purposes of [section 230] is to overrule Stratton-Oakmont [Stratton Oakmont] v. Prodigy and any other similar decisions which have treated such providers and users as Publishers or speakers of content that is not their own because they have restricted access to objectionable material.
Cordero, supra note 7, at 795 (quoting S. Conf. Rep. No. 104-230, at 435 (1996)).
In Zeran, the Fourth Circuit described this history of section 230:
Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to a New York state court decision, Stratton-Oakmont [Stratton Oakmont], Inc. v. Prodigy Servs. Co. There, the plaintiffs sued Prodigyan interactive computer service like AOLfor defamatory comments made by an unidentified party on one of Prodigy's bulletin boards. The court held Prodigy to the strict liability standard normally applied to original publishers of defamatory statements, rejecting Prodigy's claims that it should be held only to the lower "knowledge" standard usually reserved for distributors. The court reasoned that Prodigy acted more like an original publisher than a distributor both because it advertised its practice of controlling content on its service and because it actively screened and edited messages posted on its bulletin boards.
Congress enacted § 230 to remove the disincentives to self-regulation created by the Stratton Oakmont decision. Under that court's holding, computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast *1015 the service provider in the role of a publisher. Fearing that the specter of liability would therefore deter service providers from blocking and screening offensive material, Congress enacted § 230's broad immunity "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." § 47 U.S.C. § 230(b)(4). In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.
Zeran, 129 F.3d at 331 (citation omitted).
Using this history as a basis for our reading of section 230, we turn to the issue of preemption of Florida law. The reasoning of the United States District Court in Zeran is incisive and directly on point on this issue:
2. Conflict with the Language of the CDA
Preemption is also required where state law conflicts with the express language of a federal statute. In this case, Zeran seeks to hold AOL liable for its alleged negligence in allowing the bogus notices to remain and reappear after learning of their fraudulent nature from Zeran. This theory of liability derives chiefly from Cubby, a case decided over four years before the passage of the CDA. In Cubby, the district court concluded that the defendant interactive computer service, CompuServe, was a distributor for the purposes of defamation liability, and thus was liable only if it "knew or had reason to know of the alleged defamatory ... statements." This "reason to know" standard is consistent with the standard of liability for entities such as news vendors, book stores, and libraries who, while not charged with a duty to review the materials they distribute, are liable if they distribute materials they know or have reason to know contain defamatory statements. Thus, Zeran contends that on learning of the fake notice on the AOL bulletin board advertising the tasteless T-shirts, AOL had a duty to take reasonable steps to prevent the distribution of this posting. Zeran further contends that the scope of this reasonable duty, and whether AOL complied with it, are questions for a jury.
AOL responds by contending that a state cause of action for distributor liability is preempted because it directly conflicts with the language of § 230 of the CDA. Specifically, AOL points to § 230(c)(1), which states that
[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
Zeran does not contest that AOL is an interactive computer service as defined by the CDA and it is clear that AOL meets the statutory definition of such a service. Nor does Zeran claim that the bogus notices were anything but "information provided by another information content provider." Thus, the preemption issue reduces to the question whether a state cause of action for negligent distribution of defamatory material directly conflicts with the CDA's prohibition against treating an Internet provider as a "publisher or speaker." Put another way, the question is whether imposing common law distributor liability on AOL amounts to treating it as a publisher or speaker. If so, the state claim is preempted.

The key to answering this question lies in understanding the true nature of so-called distributor liability and its relationship to publisher liability. At the *1016 heart of Zeran's argument is the premise that distributor liability is a common law tort concept different from, and unrelated to, publisher liability. This is not so; distributor liability, or more precisely, liability for knowingly or negligently distributing defamatory material, is merely a species or type of liability for publishing defamatory material. This relationship is apparent from the Restatement (Second) of Tort § 577 definition of "publication" of defamatory material, which states,
(1) Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed.
(2) One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication.
Thus, a publisher is not merely one who intentionally communicates defamatory information. Instead, the law also treats as a publisher or speaker one who fails to take reasonable steps to remove defamatory statements from property under her control.
. . . .
3. Conflict with the Purposes and Objectives of the CDA
An alternative basis for preemption exists if subjecting AOL to state law distributor liability would stand "as an obstacle to the accomplishment of the full purposes and objectives of Congress" in passing § 230 of the CDA. Section 230 itself provides some insight into Congress' purposes and objectives in passing that provision, stating, in part, that
It is the policy of the United States:
. . . .
(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services; [and]
(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material....
47 U.S.C. § 230(b). The scant legislative history reflects that the "disincentive" Congress specifically had in mind was liability of the sort described in Stratton Oakmont. There, Prodigy, an interactive computer service provider, was held to have published the defamatory statements of a third party in part because Prodigy had voluntarily engaged in some content screening and editing and therefore knew or should have known of the statements. Congress, concerned that such rulings would induce interactive computer services to refrain from editing or blocking content, chose to grant immunity to interactive computer service providers from suits arising from efforts by those providers to screen or block content. Thus, Congress' clear objective in passing § 230 of the CDA was to encourage the development of technologies, procedures and techniques by which objectionable material could be blocked or deleted either by the interactive computer service provider itself or by the families and schools receiving information via the Internet. If this objective is frustrated by the imposition of distributor liability on Internet providers, then preemption is warranted. Closely examined, distributor liability has just this effect.
Zeran, 958 F.Supp. at 1132-35 (citations and footnotes omitted) (emphasis added).
*1017 This view was confirmed by the analysis of the Fourth Circuit Court of Appeal in Zeran:
Because of the difference between these two forms of liability, Zeran contends that the term "distributor" carries a legally distinct meaning from the term "publisher." Accordingly, he asserts that Congress' use of only the term "publisher" in § 230 indicates a purpose to immunize service providers only from publisher liability. He argues that distributors are left unprotected by § 230 and, therefore, his suit should be permitted to proceed against AOL. We disagree. Assuming arguendo that Zeran has satisfied the requirements for imposition of distributor liability, this theory of liability is merely a subset, or a species, of publisher liability, and is therefore also foreclosed by § 230.
The terms "publisher" and "distributor" derive their legal significance from the context of defamation law. Although Zeran attempts to artfully plead his claims as ones of negligence, they are indistinguishable from a garden variety defamation action. Because the publication of a statement is a necessary element in a defamation action, only one who publishes can be subject to this form of tort liability. Restatement (Second) of Torts § 558(b) (1977); Keeton et al., supra, § 113, at 802. Publication does not only describe the choice by an author to include certain information. In addition, both the negligent communication of a defamatory statement and the failure to remove such a statement when first communicated by another partyeach alleged by Zeran here under a negligence labelconstitute publication. Restatement (Second) of Torts § 577; see also Tacket v. General Motors Corp., 836 F.2d 1042, 1046-47 (7th Cir.1987). In fact, every repetition of a defamatory statement is considered a publication. Keeton et al., supra, § 113, at 799.
In this case, AOL is legally considered to be a publisher. "[E]very one who takes part in the publication ... is charged with publication." Id. Even distributors are considered to be publishers for purposes of defamation law:
Those who are in the business of making their facilities available to disseminate the writings composed, the speeches made, and the information gathered by others may also be regarded as participating to such an extent in making the books, newspapers, magazines, and information available to others as to be regarded as publishers. They are intentionally making the contents available to others, sometimes without knowing all of the contentsincluding the defamatory contentand sometimes without any opportunity to ascertain, in advance, that any defamatory matter was to be included in the matter published.

Id. at 803. AOL falls squarely within this traditional definition of a publisher and, therefore, is clearly protected by § 230's immunity.
Zeran, 129 F.3d at 331-32 (emphasis added). It is precisely the liability based upon negligent failure to control the content of users' publishing of allegedly illegal postings on the Internet that is the gravamen of Doe's alleged cause of action. Such publication of obscene literature or computer pornography is analogous to the defamatory publication at issue in the Zeran decisions. Therefore, our agreement with the reasoning of the federal district court answers the certified question as to preemption. Accordingly, we answer the combined and rephrased certified question in the affirmative.

*1018 FIRST CERTIFIED QUESTION
We next turn to the first certified question, which is whether section 230 applies to complaints filed after its effective date where the complaint alleges a cause of action based upon acts occurring prior to its effective date. Again, we find to be correct the reasoning of the United States District Court in Zeran:
Zeran contends that even if the CDA preempts a state law cause of action for negligent distribution of defamatory statements, it cannot have that effect here without violating the stricture against retroactive application of statutes. The CDA was signed into law and became immediately effective on February 8, 1996, over nine months after the posting of the bogus notices that form the basis of Zeran's claims against AOL. Yet, Zeran did not file this complaint until April 1996, two months after the CDA went into effect. This, then, is a case brought after a statute's enactment but based on facts that occurred prior to its enactment. In these circumstances, a statute may not have a "retroactive effect" absent a clear expression of congressional intent with respect to such retroactivity. See Landgraf v. USI Film Products, 511 U.S. 244, 280-81 [, 114 S.Ct. 1483, 128 L.Ed.2d 229] (1994). Thus, a court must first determine whether Congress has clearly expressed the statute's intended temporal reach. If so, the judicial inquiry is complete and Congress' clear intent must be implemented. Id. If, on the other hand, the statute has no express Congressional command with respect to its temporal application, courts must undertake a second inquiry to determine whether the application of the statute will result in a prohibited "retroactive effect." Id. In this case, the first step is dispositive, Congress has made its intent manifest.
Section 230 clearly reflects Congress' intent to apply the CDA to all suits filed after its enactment, notwithstanding when the operative facts arose. Thus, in § 230(d)(3), the CDA provides, in pertinent part, that
[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.
This subsection does not generally refer to conflicting state laws having "no effect" or being "preempted." To the contrary, it specifically provides that "[n]o causes of action may be brought." And such clear statutory language cannot reasonably be construed to mean that only some causes of action may be brought, namely those concerning events arising before the enactment of the CDA.
Zeran, 958 F.Supp. at 1135-37 (citations and footnotes omitted) (emphasis added).
We specifically concur that section 230 expressly bars "any actions" and we are compelled to give the language of this preemptive law its plain meaning. We therefore concur with the Fourth District Court of Appeal in its holding that Doe's cause of action against AOL is barred by the plain language of section 230(d)(3).
Accordingly, for the reasons expressed, we answer in the affirmative the first certified question and the rephrased question, which combines the second and third certified questions, and approve the decision of the Fourth District below.
It is so ordered.
SHAW, HARDING and ANSTEAD, JJ., concur.
LEWIS, J., dissents with an opinion, in which PARIENTE and QUINCE, JJ., concur.
LEWIS, J., dissenting.
I understand that it may be somewhat attractive for the majority to follow an *1019 existing published opinion from a different jurisdiction; however, I conclude that, because the analysis upon which it is based is faulty and leads to a totally unacceptable interpretation, it should not be followed.[9] Therefore, I dissent.
It is clear that Congress, through the Communications Decency Act, 47 U.S.C. § 230 (the "CDA"), intended to shield an Internet Service Provider (an "ISP") from liability due solely to implementation of a good-faith monitoring program whose goal is to preclude dissemination of illicit and improper materials through the ISP's electronic medium. Contrary to the majority's view, however, the carefully crafted statute at issue, undergirded by a clear legislative history, does not reflect an intent to totally exonerate and insulate an ISP from responsibility where, as here, it is alleged that an ISP has acted as a knowing distributor of material leading to the purchase, sale, expansion and advancement of child pornography, after having been given actual notice of the particular activity, by taking absolutely no steps to curtail continued dissemination of the information by its specifically identified customer, when it had the right and power to do so. In my view, the result obtained by this Court's interpretation of congressional intent in this area frustrates the core concepts explicitly furthered by the Act and contravenes its express purposes. Through the majority's interpretation, the so-called "Decency Act" has, contrary to well-established legal principles, been transformed from an appropriate shield into a sword of harm and extreme danger which places technology buzz words and economic considerations above the safety and general welfare of our people.
I suggest that by interpreting the statute to provide this carte blanche immunity for wrongful conduct plainly not intended by Congress, the majority view ignores the common law underpinnings of the present controversy; fails to accommodate the traditional distinction between publishers and distributors consistently recognized in American jurisprudence; overlooks the historical timing of the subject legislation in the context of developing case law; excludes proper analysis of the careful wording of the subject legislation; and does not consider the obvious intent additionally underscored by Congress both in the stated policies underlying the statute, and in the statute's legislative history. These grounds, collectivelycoupled with the rationale of the very case which the majority deems controllingwarrant a far different result.
In Zeran (as quoted in the majority opinion), the Fourth Circuit began by explaining what Congress had intended when it enacted the Communications Decency Act, 47 U.S.C. § 230. The legislation was aimed at removing "disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4). Specifically, Congress enacted the CDA as a measure to "overrule Stratton Oakmont v. Prodigy and other similar decisions which have treated such providers and users as *1020 Publishers or speakers of content that is not their own because they have restricted access to objectionable material." S. Conf. Rep. No. 104-230 at 435 (1996).
I submit that, with this predicate, a correct understanding of the Stratton Oakmont decision is thus key to a proper analysis here. In Stratton Oakmont, the court had held Prodigy, an interactive computer service like AOL, "to the strict liability standard normally applied to original publishers of defamatory statements, rejecting Prodigy's claims that it should be held only to the lower `knowledge' standard usually reserved for distributors. The court reasoned that Prodigy acted more like an original publisher than a distributor both because it advertised its practice of controlling content on its service and because it actively screened and edited messages posted on its bulletin boards." Zeran v. America Online, Inc., 129 F.3d 327, 331 (4th Cir.1997) ((emphasis quoted) quoted in majority op. supra p. 1014-15) (emphasis supplied). While the initial foray into Zeran's analysis is thus promising, its eventual conclusionand thus, the majority's corresponding conclusion in this case, patterned on the analyses contained in the two Zeran decisionsis, in my view, a startling non sequitur. Contrary to case law[10] which has traditionally recognized an important difference between distributor and publisher liability, the majority opinion rejects any such distinction, relying on the Restatement (Second) of Torts § 577a venerable treatise published in 1977[11]for the proposition that "the law treats as a publisher or speaker one who fails to take reasonable steps to remove defamatory statements *1021 from property under her control." Majority op. at 1016 (quoting Zeran v. America Online Inc., 958 F.Supp. 1124, 1133 (E.D.Va.1997)). However, close examination of the Restatement (Second) itself reflects that this reliance is misplaced, both because it is not clear, from a reading of chapter 24 of the Restatement in its entirety, that section 577(2)[12] is the section which most properly applies to this controversy, and, I suggest, becauseeven if it weresection 577 does not support the proposition for which it is cited. The fatal flaw in Zeran's logicand thus, in the majority view-is its erroneous conclusion that, under section 577 of the Restatement of Torts (Second), distributors are merely an internal category of publishers.[13]
My analysis leads to the conclusion that this is not at all what the Restatement *1022 reflects. First, distributor liability, which we must address, is defined not in section 577, but in section 581(1) (which appears to apply here). However, assuming arguendo that section 577(2) did define "distributors," it does not reflect that they are a "subset" of primary publishers. Rather, they belong to a set of entities who perform a "secondary role in disseminating defamatory matter authored and published by others." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 113, at 810 (5th ed.1984). In defining publication, the Restatement (Second) provides, in section 577(1), that "[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." In section 577(2), it provides further that one who "intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control," although not a publisher (as defined in subsection (1)), "is subject to liability for its continued publication." Restatement (Second) of Torts § 577. This is a far different statement than that contained in other parts of chapter 24, which identify different categories of actors as being "subject to liability as if [they] had originally published" the defamatory matter (§ 578), or "subject to the same liability as an original publisher" (§ 581(2)). While a proprietor who fails to remove known defamatory material exhibited on his property may be subject to tort liability,[14] such liability is not that of an original "publisher."
However, it is section 581(1)involving those who "only deliver or transmit defamation published by a third person" which more properly defines distributor liability, and which appears most applicable to AOL's activities here. In its entirety, section 581 provides:
§ 581. TRANSMISSION OF DEFAMATION PUBLISHED BY THIRD PERSON
(1) Except as stated in subsection (2), one who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character.

(2) One who broadcasts defamatory matter by means of radio or television is subject to the same liability as an original publisher.
Thus, under the more appropriate section of the Restatement (Second) of Torts, AOLnot as a publisher, but as a distributor ("one who only delivers or transmits defamatory matter published by a third person")would have potential liability where, as here, it is alleged that AOL actually knew of the illicit character of the material which it was transmitting over its Internet service. Accord, W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 113, at 810-11 (5th ed.1984). ("It would appear quite clearly that those who perform a secondary role in disseminating defamatory matter authored and published by others in the form of books, magazines *1023 and the likeas in the case of libraries, news vendors, distributors, and carriers would not be subject to liability to anyone in the absence of proof that they knew or had reason to know of the existence of defamatory matter contained in matter published.").
In my view, my colleagues in the majority overlook and fail to consider this distinction between publishers and distributors, which is key to an understanding of what Congress, in 1996, intended to accomplish by enacting the CDA. Five years earlier, in 1991, a federal district court had held, in Cubby, that the defendant Internet service provider, CompuServe, was the equivalent of "an electronic, for profit library." 776 F.Supp. at 140. The Cubby court had held, therefore, that Compu-Serve was entitled to the same first amendment protection as a "distributor," subject to liability only if it knew or had reason to know of the allegedly defamatory statements. The court stated that "CompuServe has no more editorial control over such a publication than does a public library, bookstore, or newsstand, and it would be no more feasible for CompuServe to examine every publication it carries for potential defamatory statements than it would be for any other distributor to do so." Cubby, 776 F.Supp. at 140. This finding was both consistent with the function served by the ISP in that case, and with the distinction which, historically, had consistently been made between publishers and distributors. It is not surprising, then, that Congress did not enact the CDA fast on the heels of Cubby, nor mention an intent to overrule Cubby in the legislative history of the CDA.
However, only shortly before enactment of the CDA, the court in Stratton Oakmont, faced with a similar question, reached a far different result. There, the court held that the ISP, Prodigy, would be treated as a "publisher," subject to liability regardless of its actual or imputed knowledge. See Stratton Oakmont Inc. v. Prodigy Services Co., No. 94-31063, 1995 WL 805178, *1 (N.Y.Sup.Ct. May 24, 1995). The Stratton Oakmont court distinguished Cubby because, unlike Prodigy, Compu-Serve had no opportunity to review the contents of any publication before it was uploaded. The Stratton Oakmont court concluded that, because Prodigy exercised general editorial control over its services, it should be held to the liability of a "publisher" instead of the liability of a "distributor." See id. Thus, even though the courts in Cubby and Stratton Oakmont both recognized the distinction between publisher liability and distributor liability, in characterizing the ISP's function, they reached very different results. The ISP in Stratton Oakmont, merely by virtue of its "Good Samaritan" editorial policies, was held liable for matter published on its service by third parties, even though it was not alleged to have had actual knowledge of the content of the publication.
This was obviously the legal conclusion which Congress, in enacting the CDA promptly thereafter, sought to change.[15] *1024 It reflected this intent in two ways. First, the language of the statute itself could not be more explicit. It provides, in § 230(c)("Protection for `Good Samaritan' blocking and screening of offensive material") that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." In Zeran and the majority view here, however, this statement that an ISP shall not be treated as a "publisher or speaker" of third-party information has been interpreted to mean not only that an ISP can never be subject to liability for negligence as a "publisher" of third-party information appearing on its service, but also that an ISP can never be subject to liability based upon its own patently irresponsible role as a distributor who has allegedly been given actual notice of materials published on its service by a specified customer (in furtherance of criminal conduct as defined by Florida law[16]) by soliciting the purchase and sale of explicit child pornography, yet has done absolutely nothing about it.
This flies in the face of the very purpose of the Communications Decency Act. At least one goal of the CDA is, as its title suggests, to promote "decency" on the Internet.[17] What conceivable good could a statute purporting to promote ISP self-policing efforts do if, by virtue of the *1025 courts' interpretation of that statute, an ISP which is specifically made aware of child pornography being distributed by an identified customer through solicitation occurring on its service, may, with impunity, do absolutely nothing, and reap the economic benefits flowing from the activity?
Such an absurd interpretation is totally unwarranted. If Congress had intended absolute immunity, why would it state only that no ISP "shall be treated as a publisher or speaker of any information provided by another information content provider?" As one legal commentator has observed, "[n]otably, the legislation did not explicitly exempt ISPs from distributor liability, and its specific reference to `publisher or speaker' is evidence that Congress intended to leave distributor liability intact." Developments in the LawThe Law of Cyberspace, III The Long Arm of Cyber-Reach, 112 Harv. L.Rev. 1610, 1613 (1999); see also David R. Sheridan, Zeran v. AOL and the Effect of Section 230 of the Communications Decency Act upon Liability for Defamation on the Internet, 61 Alb. L.Rev. 147, 168 (1997) ("[B]oth the text of the CDA and its meager legislative history support the conclusion that when Congress said `publisher,' it meant `publisher,' and not `distributor.' The publisher and distributor terminology have been used in cases and commentary on the subject of defamation in interactive networks. It would be reasonable to surmise that Congress would say `distributor' in addition to `publisher' if it meant `distributor' in addition to `publisher.')" (footnotes omitted). If blanket immunity were intended, why not state more broadly that no ISP "shall be held liable" for any information provided on its service by another information content provider?[18] In fact, that very phrase was used in the subsection immediately following § 230(c)(1), which provides:
(2) Civil liability
No provider or user of an interactive computer service shall be held liable on account of
(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).
(Emphasis supplied.)
The reason, pointedly, is that Congress never intended for such a broad immunity to apply. In cutting a wide swath of immunity from the cloth of this purposefully narrow language, the analysis contained in Zeran[19] (and approved by the majority here) turns on its head the very goal of the *1026 Communications Decency Act.[20] While Congress has recognized that the Internet *1027 presents a "forum for true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," 47 U.S.C. § 230(a)(3), the purpose of the CDA is not, as the Zeran court espoused, "to promote unfettered speech," Zeran, 129 F.3d at 334most particularly where such alleged speech is an invitation to purchase child pornography. To the contrary, even where objectionable material may be constitutionally protected, the CDA, which was added to "extend the standards of decency which have protected telephone users to new telecommunications devices" and to "protect the sanctuary of the home from uninvited indecencies," 141 Cong. Rec. S1953 (daily ed. Feb. 1, 1995) (statement of Sen. Exon), sanctions an ISP's good-faith efforts to block its dissemination.[21] Here, moreover, where the communications allegedly pertain to graphic sex acts involving eleven-year-old victims, First Amendment rights are not even implicated.
What is implicated is Congress's intent to shield ISPs from liability based solely on self-policing efforts to intercept the very type of material at issue hereconduct defined by society as criminal involving material which is invidiously and perniciously harmful to children. This is reflected in the second hallmark of Congress's intent in enacting the CDAthe statute's legislative history. As expressed in 47 U.S.C. § 230(b), "the stated policy of the United States" is "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." While the majority view recognizes that, as reflected in the legislative history of the CDA referenced in Zeran, "the `disincentive' Congress specifically had in mind was liability of the sort described in Stratton Oakmont," majority at 1016 (quoting Zeran, 958 F.Supp. at 1134), what it inexplicably fails to recognize is that this is not the distributor liability recognized in Cubby. Rather, it is the far stricter standard of publisher liability which was imposed in Stratton Oakmont, based solely on the ISP's implementation of laudable, self-regulating efforts to screen inappropriate material prior to its publication,[22] which efforts the CDAas *1028 expressed in the policies set forth as a preamble to the statuteunabashedly encourages.
Given the precise, limiting language of the statute, the stated policy underlying the CDA, and the CDA's explicit legislative history, it is inconceivable that Congress intended the CDA to shield from potential liability an ISP alleged to have taken absolutely no actions to curtail illicit activities in furtherance of conduct defined as criminal, despite actual knowledge that a source of child pornography was being advertised and delivered through contact information provided on its service by an identified customer, while profiting from its customer's continued use of the service. Such an interpretation transforms a statute intended to further and support responsible ISP efforts to protect children and the public from even questionably harmful and illegal materials into a statute which both condones and exonerates a flagrant and reprehensible failure to act by an ISP in the face of allegedly specific, known dissemination of material unquestionably harmful to children.[23] In my view, the interpretation adopted today provides a foundation for far-ranging forms of illegal conduct (possibly harmful to society in far different ways) which ISPs can, very profitably and with total immunity, knowingly allow their customers to operate through their Internet services. I fear that the blanket immunity interpretation adopted by the majority today thrusts Congress into the unlikely position of having enacted legislation that encourages and protects the involvement of ISPs as silent partners in criminal enterprises for profit. Confident that Congress did not intend such an incongruous result, I respectfully dissent.
PARIENTE and QUINCE, JJ., concur.
NOTES
[1] Section 847.011(1)(a), Florida Statutes (1993), provides in relevant part:

Any person who knowingly ... distributes... or offers to sell ... any obscene ... photograph ... [or] image ... is guilty of a misdemeanor of the first degree....
[2] Section 847.0135(2), Florida Statutes (1993) (Computer Pornography and Child Exploitation Prevention Act of 1986), provides in relevant part:

COMPUTER PORNOGRAPHY.A person is guilty of a violation of this section if he knowingly ... transmits by means of computer, or makes, prints, publishes, or reproduces by other computerized means, or knowingly causes or allows to be entered into or transmitted by means of computer, or buys, sells, receives, exchanges, or disseminates any notice, statement, or advertisement, or any minor's name, telephone number, place of residence, physical characteristics, or other descriptive or identifying information, for purposes of facilitating, encouraging, offering, or soliciting sexual conduct of or with any minor, or the visual depiction of such conduct.
[3] The record reflects that Russell is presently serving lengthy federal and state prison sentences arising out of events relating to those alleged in the complaint. Russell pled guilty and was convicted on federal criminal charges of sexual exploitation of children and transportation of sexually explicit material involving a minor and state criminal charges of attempted sexual battery.
[4] 47 U.S.C. § 230 provides in relevant part:

(c) Protection for "Good Samaritan" blocking and screening of offensive material
(1) Treatment of publisher or speaker
No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
(2) Civil liability
No provider or user of an interactive computer service shall be held liable on account of
(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).
(d) Effect on other laws
(1) No effect on criminal law
Nothing in this section shall be construed to impair the enforcement of section 223 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.
(2) No effect on intellectual property law
Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.
(3) State law
Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.
[5] Section 230 defines "interactive computer service" as:

[A]ny information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.
47 U.S.C. § 230(e)(2).
The statute defines "information content provider" as:
[A]ny person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.
47 U.S.C. § 230(e)(3).
[6] We accept that the allegations are based upon information distributor liability in accord with section 581 of the Second Restatement of Torts (1977) and as impliedly recognized in Cardozo v. True, 342 So.2d 1053, 1056 (Fla. 2d DCA 1977), and based upon a statutory violation under deJesus v. Seaboard Coast Line Railroad Co., 281 So.2d 198, 201 (Fla.1973).
[7] Steven M. Cordero, Comment, Damnum Absque Injuria: Zeran v. AOL and Cyberspace Defamation Law, 9 Fordham Intell. Prop. Media & Ent. L.J. 775 (1999); Annemarie Pantazis, Zeran v. America Online, Inc.: Insulating Internet Service Providers from Defamation Liability, 34 Wake Forest L.Rev. 531 (1999). See also Ben Ezra Weinstein Co. v. America Online Inc., 206 F.3d 980, 985-86 (10th Cir.2000); Does v. Franco Productions, No. 99C7885, 2000 WL 816779 (N.D.Ill. June 22, 2000).
[8] Cordero, supra note 7, at 792.
[9] See generally Gross v. State, 765 So.2d 39 (Fla.2000) (observing that, where there is no uniform interpretation by the various federal circuits regarding the interpretation of a federal statute, the approach used by any particular federal circuit is merely persuasive and not binding); Corporate Securities Group v. Lind, 753 So.2d 151, 152 (Fla. 4th DCA 2000) (explaining that, where a state appellate court is asked to decide a federal question as to which there is no Supreme Court authority directly on point, and no unified position has been established in the Circuit Courts of Appeal, the state court is obligated to decide the issue by projecting "what the [United States] Supreme Court would do if and when it ultimately confront[s] the question").
[10] Although the conduct and wrong alleged here may be far more egregious than defamation and involve other considerations, such is probably the most appropriate analogy found in our common law as to the status of the participants. Compare Miami Herald Pub. Co. v. Ane, 458 So.2d 239 (Fla.1984) (holding that, under Florida law, it is sufficient for a non-public figure plaintiff to establish, in a defamation action, that the defendant newspaper published the alleged false and defamatory statements with negligence, i.e., without reasonable care as to whether the alleged false and defamatory statements were actually true or false) with Sexton v. American News Co., 133 F.Supp. 591, 593 (N.D.Fla.1955) (recognizing that a newspaper vendor may avoid liability by showing that "he neither knew nor ought to have known that the paper he was selling contained libelous matter"), cited in Cardozo v. True, 342 So.2d 1053, 1056 (Fla. 2d DCA 1977) (examining, in the context of a tort action against the distributor of a cook book for personal injuries allegedly suffered as a result of inadequate warnings contained therein, the "closely analogous" principle that "distributors of newspapers and periodicals cannot be even held legally responsible for defamatory material contained therein where the dealer did not know and reasonably could not have known that the publication contained defamatory material"); see generally R. James George, Jr. & James A. Hemphill, Defamation Liability and the Internet, 507 Prac. L. Inst. 691, 694 (1998) ("The `publisher/distributor' distinction has existed for years in the common law of libel.").
[11] While the general common law tort principles contained in the Restatement are, of course, still viable, the treatise has yet to incorporate the realities of the World Wide Web. As observed by the author of a 1996 law review article who attempted to reconcile Cubby with Stratton Oakmont, "Megabyte. Mouse. E-mail. CD-ROM. Hard drive. Multimedia. World Wide Web. Five years ago, these were words that few in the population understood, let alone used in conversation." Matthew C. Siderits, Comment, Defamation in Cyberspace: Reconciling Cubby, Inc. v. Compuserve, Inc. and Stratton Oakmont v. Prodigy Services Co., 79 Marq. L.Rev. 1065, 1081 (1996) (concluding that, "[a]lthough some may argue that on-line services act as publishers, the proper standard to apply to on-line services is the distributor framework"); see also Yochai Benkler, Net Regulation: Taking Stock and Looking Forward, 71 U. Colo. L.Rev. 1203, 1205 (observing that "[t]he concept of regulating the Netin the lawmaking or regulatory sense, rather than engineering sensedid not exist prior to the 1990s because "the Net" did not yet exist as a society-wide communications medium"). Although the treatment of defamation in the 1977 edition of the Restatement of Torts encompasses radio and television, see § 581, Restatement (Second) of Torts (1977), it has yet to address the role of Internet presences. This would appear to be particularly apt in light of the multiple functions which the Internet now serves, including, for example, the recent publication of a Stephen King book directly on the Internet. See ht tp://www.stephenking.com/sk_120400_2.html (reflecting Stephen King's commentary regarding his recent on-line publication of The Plant, which King described as "an epistolary novel set in the early 1980s (before e-mail, in other words, and when even the fax was a fringe technology)," and regarding which, King had advised internet users: "My friends, we have a chance to become Big Publishing's worst nightmare. Not only are we going glueless, look Ma, no e-Book!"). In fact, a search of the Westlaw database of Florida decisions reveals that the word "Internet" did not even appear in Florida case law until 1996. And it was only in 1999 Amendments to the Advertising Rules in the Rules Regulating the Florida Bar that "Internet presences such as home pages or World Wide Web sites, unsolicited electronic mail communications, and information concerning a lawyer's or law firm's services that appears on World Wide Web search engine screens and elsewhere" were first regulated by this Court. See Amendments to Rules Regulating Florida Bar-Advertising Rules, 762 So.2d 392, 425 (Fla. 1999).
[12] Section 577(2) does not appear to have been cited as persuasive authority in many cases. Compare Dillon v. Waller, No. 95APEO5-622, 1995 WL 765224 (Ohio Ct. App.1995) (citing § 577(2) as persuasive authority in a defamation case involving lewd language painted on a bus parked on the defendant's property) and Southern Bell Tel. and Tel. Co. v. Coastal Transmission Service, Inc., 167 Ga.App. 611, 307 S.E.2d 83, 85 (1983) (citing § 577(2) in a case involving alleged libel which appeared in a display advertisement in the Southern Bell yellow pages telephone directory which misprinted the plaintiff's slogan, "Get it in gear," as "Get it in rear") with Dominick v. Sears, Roebuck & Co., 741 S.W.2d 290, 294 (Mo.Ct.App.E.D. 1987) (refusing to extend liability to the situation before it, which involved a suit for defamation against a department store based upon a credit report issued by a third party which the store maintained, and which contained a defamatory statement made by the third party, observing that "[t]he classic illustration of this rule is the situation of the tavern owner who fails to remove, after knowledge thereof, a libelous statement about plaintiff written by another on a wall in the restroom of his establishment") (citing § 577(2), Illustration 15). Is the function served by the provider of an Internet service "bulletin board" more like that of a physical establishment which maintains a cork bulletin board (which would be covered by § 577(2)), or more like a telephone, ticker, teletype or telegraph company (covered by § 581(1)) which transmits third-party messages for a fee? Since the subject activity involves the transmission of messages through an electronic medium, which can only be sent or received through a telecommunications interconnection for which the customer pays a fee, the latter analogy appears more appropriate.
[13] As one legal commentator has observed, the Zeran court "based its holding on a questionable interpretation of the word `publisher,' stating that `distributor' was merely a subset of the word `publisher.'" Developments in the LawThe Law of Cyberspace, III The Long Arm of Cyber-Reach, 112 Harv. L.Rev. 1574, 1613 & n. 23 (1999) (citing Zeran, 129 F.3d at 330-33, and indicating that "a more detailed criticism of the Zeran court's verbal gymnastics" can be found in David R. Sheridan, Zeran v. AOL and the Effect of Section 230 of the Communications Decency Act upon Liability for Defamation on the Internet, 61 Alb. L.Rev. 147, 168-72 (1997)).
[14] Section 577(2) of the Restatement recognizes potential liability for a proprietor's failure to remove defamatory material on his land or chattels of which he or she is aware: "when, by measures not unduly difficult or onerous, he may easily remove the defamation, he may be found liable if he intentionally fails to remove it." Dominick v. Sears, Roebuck & Co., 741 S.W.2d 290, 294 (Mo.Ct.App. 1987) (citing Restatement of Torts (Second) § 577(2) (1977)).
[15] This conclusion is further bolstered by the fact that Congressman Cox, the coauthor of section 230, during floor debate on the measure, spoke not only about the Stratton Oakmont decision, but also about the result reached in Cubby, stating:

A Federal court in New York, in a case involving CompuServe, one of our online service providers, held that CompuServe would not be liable in a defamation case because it was not the publisher or editor of the material. It just let everything come onto your computer without, in any way, trying to screen it or control it.
141 Cong. Rec. H8460-01 (daily ed. Aug. 4, 1995) (statement of Mr. Cox). This statement by Representative Cox underscored the dilemma posed by the Cubby / Stratton Oakmont analytical schism. As observed by one legal commentator:
In the wake of [Stratton Oakmont], it is likely that most major commercial on-line services will be faced with difficult choices. A service might choose to institute very strict standards to prevent any such defamatory language from reaching the bulletin boards. Alternatively, it might choose to take a totally hands-off approach in order that it appear to have no editorial control whatsoever, so as to fall under the auspices of a distributor rather than a publisher.
Siderits, supra note 11, at 1080. While the legislative history reflects Congress's intent to "overrule" Stratton Oakmont, there is no similar mention of a desire to "overrule" Cubby (despite the fact that Congress was not only presumed to be aware of that decision, but was actually reminded of it during legislative debate). Thus, as one legal commentator observed:
The result of the CDA was the re-emergence of the holding in Cubby. This distinction once made by the district court in Cubby, resurrected by Congress' CDA, seemingly destroyed any other interpretation of provider/distributor liability for ISPs. The CDA reduced the field to only distributor-type liability. Hence, individuals pursuing providers for defamatory messages posted via their servers can only prevail if the provider knew or had reason to know of the defamatory messages. Accordingly, an ISP would be akin to a bookseller, vendor, or distributor. In this manner, Congress maintained an ISP's ability to exercise editorial control without being subject to a publisher's strict liability. This pendulum, which was finally set by Congress through the CDA legislation, was then pushed in another direction with the emergence of Zeran v. America Online, Inc.
Michael H. Spencer, Defamatory E-Mail and Employer Liability: Why Razing Zeran v. America Online is a Good Thing, 6 Rich. J.L. & Tech. 25, 9 (2000) (footnotes omitted) (criticizing as erroneous Zeran's interpretation of the CDA as eliminating ISP distributor liability).
[16] See § 827.071(4), Fla. Stat. (1995) (making it illegal for any person "to possess with the intent to promote any photograph, motion picture, exhibition, show, representation, or other presentation which, in whole or in part, includes any sexual conduct by a child").
[17] See generally John Schwartz, Coalition to File Suit Over Internet Rules: Action Targets New Law as Unconstitutional, Wash. Post, Feb. 26, 1996, at A4 (explaining that President Clinton signed the CDA into law "to prevent the display of `patently offensive' materials via computer in a way that minors might see them"), cited in Robert T. Langdon, Note, The Communications Decency Act § 230: Make Sense? Or Nonsense?A Private Person's Inability to Recover if Defamed in Cyberspace, 73 St. John's L.Rev. 829, 842 n. 67 (1999). Langdon criticizes the CDA as interpreted to preclude distributor liability, concluding: "There can be no doubt that Internet providers need to assume some responsibility for the materials that pass through their services. The distributor framework appears to be the most logical solution. An Internet provider ought to be liable when it is placed on notice that it is distributing defamatory material. Anything less is simply irrational and illogical." Id. at 855.
[18] Moreover, the statute explicitly recognizes that state causes of action which are consistent with the CDA are not precluded by it. It provides, in § 230(e)(3), that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section ...." (Emphasis supplied.) It also provides: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section."
[19] While ostensibly following Zeran, the decision in Ben Ezra, Weinstein & Co. v. America Online, Inc., 206 F.3d 980 (10th Cir.2000), also cited by the majority here, is factually distinguishable. In Ben Ezra, the plaintiff argued that AOL was not immune from suit under 47 U.S.C. § 230 because AOL had acted both as an interactive computer service and as an information content provider by participating in the creation and development of the stock quotation information which was allegedly defamatory. The federal trial court concluded that AOL qualified for statutory immunity pursuant to § 230, finding no record evidence that AOL had provided any of the stock quote information at issue. On appeal, the plaintiff argued that AOL should be held liable both because it had "worked so closely with ComStock and Townsend in the creation and development of the stock quotation information that it also operated as an `information content provider,'" and because AOL had "deleted some stock symbols or other information from the data base in an effort to correct the errors." 206 F.3d at 985. The appellate court first stated its belief that the plaintiff had "not demonstrated [AOL] worked so closely with ComStock and Townsend regarding the allegedly inaccurate stock information that [it] became an information content provider." Id. The appellate court then observed that, by deleting the symbols, AOL, which "simply made the data unavailable and did not develop or create the stock quotation information displayed," was merely "engaging in the editorial functions Congress sought to protect." Id. at 986. Thus, the plaintiff in Ben Ezra unsuccessfully sought to hold AOL liable as an original publisher based both upon unproven allegations that AOL had become an information content provider by working closely in the development of inaccurate information posted on its Internet site, and upon an erroneous legal theory that AOL's editorial efforts to remove such information after it was posted also rendered AOL liable as an original publisher. Cf. also Doe v. Franco Productions, No. 99 C 7885, 2000 WL 816779 (N.D.Ill., Jun.22, 2000) (similarly rejecting, on the basis of immunity, the claim of thirty university football players that the defendant Internet service providernot shown to be an information content provider, nor alleged to have been given actual notice of any illegal activityhad liability as a publisher based upon the posting, sale and dissemination by third-party users of the ISP's web page of certain images of the athletes in various states of undress which, without the athletes' knowledge or consent, had been obtained by use of hidden videotape cameras in restrooms, locker rooms, or showers).

While, therefore, application of Zeran's faulty logic was not dispositive based upon the allegations and theories of liability asserted in Ben Ezra and Franco Productions, nonetheless, the Pied Piper effect of Zeran's initial analysis does appear to have diverted some other authors of its progeny from more closely examining the difference between distributor and original publisher liability where such distinction might arguably apply. In Green v. America Online, Inc., No. 00-3367 (D.N.J. Dec. 20, 2000), for example, the federal district court found that, pursuant to 47 U.S.C. § 230, AOL was immune from suit based upon certain tort claims based upon allegations "that AOL negligently failed to live up to its contractual obligations to Green, by refusing to take the necessary action against [users of an AOL "chat room" in which Green participated] that would prevent them from further harming and defaming [Green]" by impersonating him in sending messages to other men in the chat room asking them for homosexual sex, and in sending messages to women in the chat room telling them that Green was bisexual. The court, in dismissing the plaintiff's tort claims, briefly stated its reliance upon Ben Ezra and Zeran, wholly failing to address any potential distinction between original publisher liability and distributor liability.
[20] Legal commentaries reflect a variety of views regarding Zeran; many of these are critical of Zeran's analysis. See, e.g., Ian Ballon, Zeran v. AOL: Why the Fourth Circuit Is Wrong, J. Internet L., Mar. 1998, at 6; Steven M. Cordero, Comment, Damnum Absque Injuria: Zeran v. AOL and Cyberspace Defamation Law, 9 Fordham Intell. Prop. Media & Ent. L.J. 775 (1999) (criticizing the Fourth Circuit's decision in Zeran, arguing that the court overextended protection to ISPs); R. Hayes Johnson, Jr., Defamation in Cyberspace: A Court Takes a Wrong Turn on the Information Superhighway in Stratton Oakmont, Inc. v. Prodigy Services Co., 49 Ark. L.Rev. 589, 595 (1996) (examining the problems that could result from the Stratton Oakmont approach); David R. Sheridan, Zeran v. AOL and the Effect of Section 230 of the Communications Decency Act upon Liability for Defamation on the Internet, 61 Alb. L.Rev. 147 (1997); Michael H. Spencer, Defamatory E Mail and Employer Liability: Why Razing Zeran v. America Online is a Good Thing, 6 Rich. J.L. & Tech. 25 (2000); David Wiener, Negligent Publication of Statements Posted on Electronic Bulletin Boards: Is There Any Liability Left After Zeran?, 39 Santa Clara L.Rev. 905 (1999). Most particularly where, as here, there is no consensus of opinion expressed by the federal appellate courts to provide guidance regarding the correct interpretation of the federal statute at issue, the opinion expressed in Zeran is merely persuasive, and not controlling. Cf. Gross v. State, 765 So.2d 39 (Fla.2000) (observing that, where "the various federal circuits are in disagreement on the appropriate definition" of an applicable term under a subject federal statute, this Court is free to adopt either the narrow view or the broad view of the statute, "because the approach used by any particular federal circuit is merely persuasive and not binding").
[21] Although the Supreme Court later deemed unconstitutional those portions of the CDA which prohibited the transmission of indecent material, see Reno v. ACLU, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (approving district court's judgment enjoining the Government from enforcing § 223(a)(1)(B)'s prohibitions insofar as they relate to "indecent" communications and from enforcing § 223(d)), § 230, providing protection for "Good Samaritan" blocking and screening of offensive material, has not been invalidated.
[22] In light of the various roles which ISPs are now assuming in transmitting information on the Internet, a function-based analysis of potential ISP liability under the CDA would appear to be most appropriate. See generally Joshua M. Masur, A Most Uncommon Carrier: Online Service Provider Immunity Against Defamation Claims in Blumenthal v. Drudge, 40 Jurimetrics J. 217, 227 (2000) (advocating an approach which reconciles the CDA with the common law by looking to the role played by the ISP in each case: "Functional line-drawing appears to be the only fair, effective, and accurate manner to interpret the statute. Differentiating a common carrier acting as such from one that acts as a republisher provides immunity where appropriate, yet maintains liability where immunity is inappropriate. Such an interpretation would maintain the clear common law standards for republication liability where it remains unchallenged, yet negate the dubious precedentStratton Oakmontat which section 230 was squarely directed."); see also Sheri Hunter, Defamation and Privacy Laws Face the Internet, 17-FALL Comm. Law. 16, 17 (interpreting section 230 of the CDA as granting a "distributor" status to ISPs, and arguing that, when an ISP knowingly distributes defamatory messages, it should not be afforded such a status).
[23] The absurd implications of Zeran are contrary to the very core of the Communications Decency Act, which, through section 509 of the Telecommunications Act of 1996 (entitled "On-line Family Empowerment") added § 230 (entitled "Protection for private blocking and screening of offensive material"). As stated in one legal commentary:

The result [in Zeran] gives an ironic twist to Congress' response to Stratton Oakmont: information service providers can not incur liability for their failure to monitor content, because to hold otherwise would provide them with an incentive to fail to monitor content! The CDA's protective umbrella, intended for "good Samaritan" monitors, turns out also to shield those who can not or will not provide such a service.
Stephen J. Davidson et al., The Law of Cyberspace Liability of Information Service Providers, 574 Prac. L. Inst. 143, 155 (2000) (emphasis supplied).